# EXHIBIT 1
# Part 2 of 2

foregoing or anything in this Agreement to the contrary, either Party (and any employee, representative, or other agent of such Party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure; *provided however*, that such disclosure may not be made to the extent reasonably necessary to comply with any applicable federal or state securities laws. For the purposes of the foregoing sentence, (i) the "tax treatment" of a transaction means the purported or claimed federal income tax treatment of the transaction, and (ii) the "tax structure" of a transaction means any fact that may be relevant to understanding the purported or claimed federal income tax treatment of the transaction.

**11.3   Notice.** Any notice, approval, authorization, consent, or other communication required or permitted to be delivered to either Party under this Agreement must be in writing and will be deemed properly delivered, given, and received (a) when delivered by hand, (b) two (2) business days after delivered by courier or express delivery service or by facsimile to the address or facsimile number set forth beneath the name of such Party below (or to such other address or facsimile number as such Party may have specified in a written notice to the other party) or (c) by email to the Party at the email address listed below accompanied by confirmation that such email has been received:

If to Licensor, to:

Cloud Nine Designs LLC

445 Dakota Blvd.

Boulder, CO 80304

Attn: M'Lisa Kidman McKee

If to Licensee, to:

Olixo Holdings, LLC

3812 Pinehurst Dr.

Eagle Mountain, UT 84005

Attn: Craig Morris

**11.4   Governing Law; Venue.** This Agreement will be construed in accordance with and governed in all respects by the laws of the State of Colorado without regard to any conflicts of law principles which would result in application of laws of any other jurisdiction. Any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement may be brought or otherwise commenced in any state court located in the County of Boulder, Colorado any federal court located in the District of Colorado. Each Party expressly and irrevocably consents and submits to the jurisdiction of each such state and federal courts (and each appellate court located in the State of Colorado in connection with any such legal proceeding.

**11.5   Export Law.** Licensee will comply with all applicable export and import control laws and regulations in providing the Licensed Products. In particular, Licensee will not export or re-export any technical data or confidential information derived from or pertaining to the Licensed Patents or Licensed Products without all required U.S. and foreign government licenses.

**11.6   Manufacturing Practices.** Licensee shall abide by all applicable labor and manufacturing laws throughout the world when sourcing, assembling, manufacturing, shipping and selling Licensed Products.

11.7   **Insurance.** Licensee must maintain commercial general liability insurance in the amounts of not less than $2,000,000 per incident and $2,000,000 annual aggregate. Licensor, and its employees and agents will be named as additional insured. Licensee's insurance obligation will continue one (1) year from termination.

11.8   **Assignment.** Neither Party may assign nor transfer any of its rights under this Agreement or delegate any of its obligations or duties under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld. A Change in Control (defined below) shall constitute an assignment or transfer of a Party's rights under this Agreement. Any attempted assignment or delegation without such consent will be null and void. To the extent any such assignment is permitted, this Agreement will be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

As used herein, **"Change in Control"** of a Party means (i) any consolidation or merger of Party with or into any other entity in which the holders of Party's outstanding shares immediately before such consolidation or merger do not, immediately after such consolidation or merger, retain stock representing a majority of the voting power of the surviving entity or stock representing a majority of the voting power of an entity that wholly owns, directly or indirectly, the surviving entity; (ii) the sale, transfer, or assignment of securities of Party representing a majority of the voting power of all of Party's outstanding voting securities to an acquiring party or "group" (as defined under the Securities Exchange Act, as amended); (iii) the sale of all or substantially all of Party's business or assets; or (iv) any series of related transactions that would fall within clause (i), (ii), or (iii) above if viewed as a single transaction.

If either Party complies with the following conditions, the other Party shall not unreasonably withhold its consent to any proposed assignment or transfer of such Party's rights under this Agreement, subject to the reasonableness factors set forth below. The Party desiring to transfer shall give written notice to the other Party of any proposed transfer at least thirty (30) days but not more than one hundred eighty (180) days prior to the proposed commencement date of the assignment. The notice shall set forth or be submitted with the following: (a) the name of the proposed transferee, (b) a full description of the terms and conditions of the proposed transfer, including copies of any and all documents and instruments, any purchase and sale agreements, assignment agreements and all other writings concerning the proposed transfer, (c) a business plan for the proposed transferee's operations, including a statement of projected income, expense, and cash flow for such operation for the two (2) years following the proposed effective date of the transfer, (d) a list of personal, business and credit references of the proposed transferee, (e) the balance sheets and profit and loss statements for the proposed transferee or any other person to be liable for the transferring Party's obligations under this Agreement covering the prior two (2) years (or for such shorter period as the proposed transferee or other person may have been in existence), all certified as true and correct by the proposed transferee, or an authorized officer thereof or such other person as may be liable for transferring Party's obligation under this Agreement, and (f) any other information, documentation or evidence that may be reasonably requested by the non-transferring Party.

The Parties hereto agree and acknowledge that, among other circumstances for which the non-transferring Party could reasonably withhold consent to a proposed assignment or transfer, it

shall be reasonable for such non-transferring Party to withhold consent where (1) the non-transferring Party reasonably disapproves of the transferee's reputation or creditworthiness, or (2) the transferee's net worth, credit and financial responsibility are not, considering the responsibilities involved, reasonably satisfactory to the non-transferring Party.

**11.9  Sale of Assets.** If, Licensee desires to enter into a transaction to sell or otherwise transfer any business entity or other assets that have been built around the rights granted to Licensee under this Agreement to a third party (in conjunction with the assignment of this Agreement contemplated under Section 11.8 above), the following conditions shall be incorporated into any such transaction:

**(a)** On or before the closing of such transaction, Licensee shall pay Licensor an amount equal to the greater of either: (i) three times (3x) the royalty amounts that Licensee paid Licensor for the previous full year of the Term, or (ii) six hundred thousand dollars ($600,000.00).

**(b)** In exchange for the consideration set forth in Section 11.9(a) above, the license granted by Licensor under this Agreement shall be assigned to such third party and the term of such assigned license shall become perpetual with respect to such third party.

**(c)** All other terms of such assigned license shall remain unchanged and in full force and effect, including, but not limited to, the royalty provisions of Section 5.0.

**11.10  Attorneys' Fees.** If any legal action is brought to enforce this Agreement, the prevailing Party will be entitled to receive its attorneys' fees, court costs, and other collection expenses, in addition to any other relief it may receive.

**11.11  Waiver.** All waivers must be in writing and signed by an authorized representative of the Party to be charged. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

**11.12  Severability.** If any provision of this Agreement is unenforceable, such provision will be changed and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect.

**11.13  Independent Contractors.** This Agreement is not intended to establish any partnership, joint venture, agency, or other relationship between the Parties except that of independent contractors.

**11.14  Exclusive Relationship.** The relationship established by this Agreement is exclusive. Licensor is prohibited from licensing the Licensed Patents to any third party or from developing, using, distributing, licensing or marketing services competitive with the Licensee Service during the Term of this Agreement.

**11.15   Construction.**  The section headings in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be used against Licensor in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."  All references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

**11.16   Counterparts**. This Agreement may be executed in several counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**11.17   Entire Agreement.**  This Agreement, along with the Exhibits hereto, sets forth the entire understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings between the Parties relating to the subject matter hereof. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of both Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**LICENSOR:**

By: _M'Lisa K McKee_
Name: _M'LISA K McKEE_
Title: _OWNER_

**LICENSEE:**

By: _[signature]_
Name: _CRAIG MORRIS_
Title: _OWNER_

# Exhibit A

## Licensed Patents and Patent Applications

US 8,151,386
USD 677,961
US Application Serial Number 13/420,454.

## EXHIBIT B – ROYALTIES AND COMMERCIAL DILIGENCE

### ROYALTIES

| | |
|---|---|
| Upfront Fees | $10,000.00 will be paid to Licensor upon execution of the license. |
| Running Royalty | $6 per Unit based on worldwide Licensee sales of Licensed Products for the first 20,000 Units sold each year.<br><br>$4 per Unit based on worldwide Licensee sales of Licensed Products for any Unit sold after the first 20,000 Units sold each year.<br><br>5% based on worldwide Licensee revenue from Net Sales of Licensed Products excluding the sales of any and all Units.<br><br>All payments due shall be made in four quarterly payments. |
| Minimum Royalty | Minimum annual royalty payments:<br><br>Year 1    No minimums;<br>Year 2    $100,000.00;<br>Year 3    $150,000.00;<br>Years 4+ (if applicable)   $200,000.00<br><br>Minimum annual royalty payments are to be made in four quarterly payments. |

### Commercial Diligence

| | |
|---|---|
| Milestones | Licensee must demonstrate technical and commercial diligence by meeting the following milestone schedule:<br><br>Milestone 1: 6 months from the Effective Date: Licensee will demonstrate a completed branding, production, and marketing plan with finished goods available for purchase in the United States;<br><br>Milestone 2: 12 months from the Effective Date: Licensee will demonstrate market penetration to show brand awareness by consumers.<br><br>Milestone 3: 18 months from the Effective Date: Licensee will demonstrate average monthly sales of at least 1,200/Units per month. |